# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **MICHAEL T. FUESTING** | * | **CIVIL ACTION NO. 02-2511** |
| **VERSUS** | * | **MAGISTRATE JUDGE HILL** |
| **LAFAYETTE PARISH BAYOU VERMILION DISTRICT, ET AL** | * | **BY CONSENT OF THE PARTIES** |

## REASONS FOR JUDGMENT

On January 8-9, 2008, the Court conducted a bench trial of this matter. Appearing at the trial were James P. Lambert, representing plaintiff, Michael T. Fuesting ("Fuesting"); Kraig T. Strenge, representing defendants, Lafayette Parish Bayou Vermilion District and Lafayette Insurance Company ("BVD"), and Harold L. Savoie, representing defendant, Keith Griffin ("Griffin"). The parties were given until the close of business on January 14, 2008 to file post-trial briefs. BVD filed a brief on January 14, 2008. [rec. doc. 213]. Thereafter, the Court took the matter under advisement.

## *Findings of Fact*

The Court makes the following findings of fact in accordance with Federal Rule of Civil Procedure 52(a):[1]

1. The Bayou Vermilion District ("BVD") is a political subdivision of the State of Louisiana whose purpose is to improve the water quality of the Vermilion River (the

---

[1] To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

"River") and to promote it as a recreational asset. In that regard, the BVD removed trash and trees from the River to keep it clear and open for recreational navigation.

2. In 1994 Keith Griffin ("Griffin") purchased a shrimp boat named the "Cathy B" for $7,500. Griffin brought the vessel to a drydock in Intracoastal City, Louisiana, and began working to refurbish the vessel.

3. Griffin located a dock on the River, in Lafayette Parish, and arranged with the owner of the dock, Alfred Hatch ("Hatch"), to tie the vessel up at the dock, and provide electricity to the vessel to run the bilge pumps, for $35 per month.

4. Sometime thereafter, Griffin moved to the "Cathy B" from Intracoastal City upriver, where he secured it to Hatch's dock. The dock is located downstream from the Pinhook Road bridge over the River.

5. Griffin was contacted by the Executive Director of BVD, Jim Akers, who asked Griffin for permission for the BVD to remove the "Cathy B" from the River, at BVD's cost, because the "Cathy B" had sunk. This was the first notice that Griffen had that the "Cathy B" had sunk.

6. Complaints from residents overlooking the River, who complained that the "Cathy B" was an "eyesore", caused to the BVD to attempt to remove the "Cathy B".

7. The BVD and Griffin, as owner of the "Cathy B", signed an agreement, dated January 5, 2000, to allow the BVD to remove the "Cathy B" from the River.

8. On or about January 4, 2001, BVD personnel attempted to float the "Cathy B" by pumping water out of the hold. If the BVD personnel were successful in re-floating the "Cathy B", they intended to push it further downstream to the Rotary Point Landing where the "Cathy B" would be removed from the River and loaded onto a truck.

9. After pumping water out of the "Cathy B" for several hours, the BVD crew believed that the boat had regained some buoyancy. At that time, the foreman of the BVD crew, Rene Bordelon ("Bordelon"), "nudged" the front of his boat up against the "Cathy B" to see if the "Cathy B" would move. The "Cathy B" rotated approximately 160° and moved slightly away from the dock where it had been moored (more into the river channel), where it sank. No further attempt was ever made to move the "Cathy B" by the BVD. Griffin was never notified by the BVD that the attempt to remove the "Cathy B" from the River had failed.

10. No markers, buoys or other type of warning devices were placed around the "Cathy B" at that time, or at any time thereafter.

11. At the time of this incident, the River was in a high water stage, but had not been closed to River traffic by the BVD.

12. At approximately 4:30 p.m. on July 3, 2001, Fuesting launched his boat into the River at the Beaver Park launch, which is maintained by the BVD. He was accompanied by John Mitchell Ardoin ("Ardoin").

13. Fuesting was a relatively inexperienced small boat operator and this was the first boat that Fuesting had ever owned.

14. Fuesting had never operated a vessel on the River prior to this occasion, and was not familiar with the River, generally.

15. After launching the boat, Fuesting and Ardoin proceeded downriver to approximately Milton, Louisiana to test the boat's engine. At that point, Fuesting and Ardoin turned the boat around and proceeded back upstream toward Beaver Park.

16. Before reaching the Beaver Park launch site, the boat, being driven by Fuesting, allided the "Cathy B" at approximately 7:00 p.m.

17. The "Cathy B" was first seen by Ardoin approximately 3-4 seconds before the allision. Ardoin attempted to warn Fuesting, but the allision occurred before Fuesting could avoid the allision. Fuesting's boat was traveling approximately 25-30 mph at the time of the allision.

18. The water level in the River was high because of recent rains from Hurricane Allison. Only the very top of the cabin roof of the "Cathy B" was visible, as were various outriggers and antennae which were projecting above the cabin roof.

19. On the day of the accident, official sunset was at 8:14 p.m. Because of the angle of the sun, and the heavily wooded banks of the river, the "Cathy B" and the antennae thereon were in substantial shade and hard to see.

20. As a result of the allision, Fuesting was partially ejected from the boat and was briefly knocked unconscious; he sustained a cut to his head.

21. After the accident, Fuesting was brought to the house of a friend where his injuries were dressed. Fuesting declined to go to the hospital for medical treatment on the day of the accident.

22. The day after the accident, Fuesting went to Southwest Medical Center where he was treated.

23. Fuesting was thereafter treated by Dr. John Cobb, a Board Certified Orthopedic Surgeon.

24. After the accident, a cervical x-ray demonstrated cervical spondylosis at C6-7. Dr. Cobb recommended surgery to Fuesting's cervical spine, which surgery never occurred.

25. Dr. Cobb performed an anterior acromioplasty with release at Lafayette General Medical Center on July 23, 2002.

26. In November 2002, Fuesting told Dr. Cobb that his back pain was intermittent and manageable and that his neck pain was moderate and manageable.

27. Fuesting made a complete recovery from his shoulder surgery. Fuesting continues to complain of pain in his neck, back, hips and shoulders.

28. Fuesting, at various times after the accident, sought out physicians who would prescribe narcotic pain medication for him. Fuesting has had a drug abuse problem since his early teenage years; his drug of choice is cocaine.

29. This accident neither caused, nor exacerbated, Fuesting's drug habit nor drug dependency.

30. At the time of the accident, Fuesting was working as an offshore production operator, and was employed as a contract production operator.

31. Fuesting continued to work at his regular job after this accident until he was fired by his employer in February, 2002. In 2002, up to the date of his termination, Fuesting earned wages in the amount of $5,147.

32. The termination notice stated that Fuesting was terminated for reasons including "safety issues" and "laziness". The court finds that Fuesting's testimony to the effect that he was fired as a result of the injuries which he received in this accident, to be incredible, and the Court gives no weight to that testimony.

33. Fuesting worked on an "off and on" basis after being fired.

34. Shortly before trial, Fuesting was employed by Timco at the rate of $14.26 per hour, but lost that job when he was arrested for failure to appear at a state court child support hearing.

35. Fuesting's income tax returns show the following earned income in the indicated tax years: 2001-$40,249; 2000-$38,318; 1999-$13,378.

36. Fuesting has incurred medical expenses in the amount of $40,038.58, as a result of this accident.

37. Dr. Wayne Lindemann is a board certified physician in physical medicine and rehabilitation and a certified disability examiner. He performed an examination of Fuesting on September 22, 2004. The plaintiff failed to give a truthful history to Dr. Lindemann, and did not disclose numerous prior accidents to Dr. Lindemann.

38. Fuesting was repeatedly impeached at trial on multiple issues. Given the multiple instances of impeachment on highly material issues, and Feusting's general demeanor on the witness stand, the Court does not find Fuesting's testimony regarding his physical condition, his inability to continue work and the reason for his termination from his previous employment in 2002 to be entirely credible. The court finds that Fuesting's testimony was generally not credible.

39. The Court finds that Fuesting's shoulder injury and resultant surgery was caused by this accident. The Court further finds that Fuesting's cervical condition preexisted this accident, but was exacerbated by this accident. Finally, the court finds that Fuesting's lumbar condition preexisted this accident but was exacerbated by this accident.

40. The Court finds that Fuesting's decision not to have surgery on his neck was not as a result of poverty, since Fuesting, at that time, was eligible for treatment and surgery, if necessary, in the Louisiana Charity Hospital system.

41. The Court finds that since Fuesting was fired before his surgery, Fuesting has failed to prove any past wage loss.

42. The Court finds that Fuesting failed to prove entitlement to any future medical expense.

43. The Court finds that Fuesting failed to prove that he was unable to continue his pre-accident employment as a result of this accident.

44. The court finds that after his recovery from his shoulder surgery, Fuesting was physically able to return to his pre-accident employment.

## *Conclusions of Law*

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following conclusions of law:

1. The Wreck Act, 33 U.S.C. § 409, provides in relevant part:

   > [W]henever a vessel, raft or other craft is wrecked and sunk in a navigable channel, it shall be the duty of the owner, lessee, or operator of such sunken craft to immediately mark it with a buoy or beacon during the day and, unless otherwise granted a waiver by the Commandant of the Coast Guard, a light at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner, lessee, or operator so to do shall be unlawful; and it shall be the duty of the owner, lessee, or operator of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently ....

2. The Wreck Act makes it unlawful for a vessel owner, operator, or lessor to sink or cause any vessel to be sunk in a navigable channel. *In re Barnacle Marine Management Inc.*, 233 F.3d 865, 868 (5th Cir. 2000).

3. Under § 409, the owner, operator, or lessor has a duty under to immediately remove such a wreck. *Id*.

4. The Wreck Act is judged by negligence standards. *Exxon Shipping Co. v. Cailleteau,* 869 F.2d 843, 846 (5th Cir. 1989).

5. In *Fuesting v. Lafayette Parish Bayou Vermilion Dist.*, 2005 WL 1676657 (W.D. La. 2005), the trial Court held as follows:

> [T]he agreement between the District and Griffin, and the actions taken by the District, do not render the District an "operator" of the sunken shrimp boat as that term was intended under the Wreck Act. Even if the Court determined that the document signed by Griffin was sufficient to create a towing contract, which it does not, the fact remains that the boat was never towed anywhere by the District, whose attempt to move the boat was almost completely unsuccessful.

*Id.* at *4.

6. The Fifth Circuit reversed and remanded this matter, finding that the district court's application of the term "operator" was too narrow and ran counter to the original purpose of the Act and the purpose of the 1986 amendment.[2] *Fuesting v. Lafayette Parish Bayou Vermilion Dist.*, 470 F.3d 576, 579-80 (5th Cir. 2006).

7. The Fifth Circuit stated in *dicta* that BVD could potentially be liable as an operator based on an oral towing contract with Griffin. 470 F.3d at 580.

8. A purpose of the Wreck Act was to facilitate the marking or removal of dangerous obstructions in navigable waters. *Id.* at 579-80 (*citing Univ. of Tex. Med. Branch v. United States*, 557 F.2d 438, 441 (5th Cir. 1977)).

---

[2]In 1986, Congress amended the Wreck Act, replacing the fault-based standard with a strict liability standard. *In re Barnacle Marine Mgmt. Inc.*, 233 F.3d 865, 868 n. 6 (5th Cir.2000).

9. The purpose of amending the Wreck Act in 1986 was to increase the ability of the Corps of Engineers to recover wreck-removal expenses. *Id*. (*citing* S. Rep. No. 99-126, at 26 (1985) (noting that ordinarily recovery costs exceed salvage value)).

10. A towing vessel can violate the Wreck Act and, therefore, has responsibility for the removal of a sunken tow owned by a non-negligent party. *See Agri-Trans Corp. v. Gladders Barge Line, Inc*., 721 F.2d 1005, 1008 (5th Cir.1983) (noting that "the cost of recovering a sunken vessel can be imposed on a negligent non-owner"). *See also St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co.*, 666 F.2d 932, 941 (5th Cir.1982) ("[T]he negligent owner of the towing vessel . . . would be personally liable to the government for the cost of removal of the sunken vessel as a hazard to navigation unless [the owner] promptly removed the barge.").

11. The Wreck Act's prohibition and scope apply to both owners and non-owners of vessels who intentionally or negligently cause them to sink. *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 459-63 (5th Cir.), *cert. denied*, 469 U.S. 832, 105 S.Ct. 120, 82 L.Ed.2d 63 (1984), *later proceeding*, 661 F.Supp. 1096 (E.D.La.1987), *aff'd in part and rev'd in part*, 863 F.2d 1190 (5th Cir.1989); *University of Texas Medical Branch at Galveston v. United States*, 557 F.2d 438, 444 (5th Cir.), *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1977); *Exxon,* 869 F.2d at 846.

12. Under 33 U.S.C. § 409, a negligent non-owner may be liable to a vessel which struck a wreck that had been submerged over three years prior to the collision.

*Nunley*, *supra*.

13. If the evidence establishes that a submerged metal object was part of a sunken vessel wrecked previously, then all negligent actors, including the owner of the ship, are liable for the sunken ship. *Allied Chemical Corp. v. Hess Tankship Co.*, 661 F.2d 1044, 1060 (5th Cir.1981).

14. Oral towage contracts are valid in admiralty. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 734, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

15. An entity that enters a towing contract but subsequently fails to tow the vessel as far as intended does not escape operator status because of its failure.

16. Accordingly, the Court finds that BVD was an operator such as to render it liable under the Wreck Act.

17. Even if the Wreck Act does not apply to the BVD, general principles of maritime tort support liability, for at least apportioned damages resulting from post-sinking collisions with the wreck, on the part of the wrong-doer who negligently caused it. *Nunley*, 727 F.2d at 465 (citing *United States v. M/V Big Sam*, 681 F.2d 432, 443 (5th Cir.1982) ("[N]egligent conduct on the navigable waters that causes loss to another constitutes a maritime tort.").

*Allocation of Fault*

18. The Supreme Court has instituted the principle of comparative fault in maritime cases, replacing the doctrine of major-minor fault in allocation of responsibility for

collision. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), *Nunley*, 727 F.2d at 463.

19. The Court finds that BVD is liable under the Wreck Act and/or maritime tort.

20. First, the Act provides that when a vessel is sunk in a navigable channel, the operator of the wreck must mark the sunken vessel with a buoy or beacon. *University of Texas Medical Branch at Galveston v. United States*, 557 F.2d at 444.

21. BVD did not mark the sunken vessel with a buoy, beacon or otherwise in this case.

22. Second, the Act requires that the operator commence the immediate removal of the sunken vessel, and prosecute such removal diligently. 33 U.S.C. § 409.

23. By entering into the towing contract with Griffin, BVD assumed liability for removal of the sunken vessel.

24. Additionally, the Court finds that the BVD employees were negligent in leaving the "Cathy B" where it sank, farther into the River channel than it had been before they attempted to move it, and that this negligence was a proximate cause of this allision since Fuesting may not have allided with the "Cathy B" had that vessel not ben moved.

25. There is insufficient evidence in the record for the court to hold that the allision would have occurred even if the "Cathy B" had not been moved from the Hatch dock.

26. Fuesting was negligent in failing to see the partially submerged "Cathy B" prior to hitting it with his boat.

27. Fuesting was negligent in violating the rules governing the operation of vessels in inland waters by not operating his vessel in the center of the channel.

28. Fuesting was negligent in operating his vessel at an unsafe speed for the existing conditions, in a waterway with which he was unfamiliar.

29. Based on the evidence, the Court assesses damages as follows:

| | |
|---|---|
| Past medical expenses: | $ 40,038.58 |
| Future medical expenses | $ 0 |
| Past lost wages: | $ 0 |
| Future lost wages: | $ 0 |
| Past General damages: | $ 55, 000.00 |
| Future General damages: | $ 10,000.00 |
| **TOTAL DAMAGES** | **$ 105,038.58** |

30. The Court assesses comparative fault on Fuesting at 80%.

31. The Court assess comparative fault on BVD at 20%.

32. The Court assess comparative fault on Griffin at 0%.

33. The total amount of damages awarded to Fuesting, reduced for his assigned fault, is $21,007.72.

34. The Court finds that an award of prejudgment interest from the date of judicial demand is appropriate in this case at the rate of 2.08 %, which is the most recently quoted rate for one-year constant maturity treasury bills, on the plaintiff's past damages.

35. The plaintiff is entitled to recover post judgment interest as allowed by law.

*Conclusion*

Accordingly, judgment is awarded in favor of the plaintiff in the amount $21,007.72, plus prejudgment interest at the rate of 2.08 % on the past damages and post judgment interest as allowed by law.

September 11, 2008, Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE